## ELBRIDGE G. MARTIN *vs.* JOHN HILTON.

By the Rev. Sts. *c.* 32, the pilotage district, which includes the harbor of Boston, ex-
tends from Nahant Rock, on the north, to the highlands of Marshfield, on the south;
and the words "port of Boston," or "harbor of Boston," as used in reference to the
regulation of pilotage, include all the ports which use the several channels leading
to the city of Boston, and the mouths of the rivers which empty into that harbor.

*It seems,* that it is the duty of the pilots for the harbor of Boston to take charge of a ves-
sel which is subject to the pilotage laws, as well when such vessel is bound to Wey-
mouth, Dorchester, Cambridge, or Charlestown, as when bound to Boston; and that
they are entitled to their fees, when they seasonably offer their services to such ves-
sel, and their offer is refused.

The eighth rule for regulating the pilotage of the harbor of Boston, prescribed by the
commissioners of pilots, in 1835, was not intended to give, and does not give, the true
meaning of the word "harbor," as used in the Rev. Sts. *c.* 32, and as understood by
those who navigate the waters of the bay.

In a suit, by a pilot of the harbor of Boston, to recover pilotage fees of the master of a
vessel which was subject to the pilotage laws, and bound to Weymouth, and to whom
the plaintiff had seasonably offered to pilot the vessel through the waters of his dis-
trict, and then leave the defendant to take a river pilot, it was *held,* that parol evi-
dence was admissible to show that the waters of the "harbor of Boston" (which was
the pilot's district) extended only to the mouths of the rivers emptying into that har-
bor, and also to show a usage of the pilots, for the last forty years, to pilot vessels,
that were to unlade at towns situated on said rivers, as far as the mouths of the rivers,
and then leave them to take a river pilot.

THIS was an action of assumpsit to recover fees of pilotage.
At the trial, in the court of common pleas, before *Merrick,* J.
the parties agreed upon the following facts: "The plaintiff,
being lawfully commissioned as a pilot for the harbor of Bos-
ton, and being on the outside or easterly of a line drawn from
Harding's Rocks to the Outer Graves, and from thence to Na-
hant Head, being the line fixed by law, (Rev. Sts. *c.* 32, §
24,) hailed the brig Zephyr, she being a foreign vessel, of suf-
ficient burden to make her liable to pay pilotage fees, whereof
the defendant was master, and offered his services to pilot said
brig into and through the waters of said harbor; and he, the
said defendant, refused to receive said pilot on board, in the
language following: Pilot hailed. 'Will you take a pilot?'
Captain answered, 'yes, if you will take me where I am
bound to, Weymouth.' Pilot. 'I will take you through our
waters, which is as far as I know, and then you can get a
river pilot.' Captain. 'Cannot I make a bargain with you?'

Pilot. 'No. I shall charge you the Boston pilotage, whether you take me or not.' Captain. 'I will see about that.' The said brig did go through the waters of the harbor of Boston, a distance of about six miles, on her way to Weymouth."

The plaintiff contended that, upon this statement of facts, he was entitled to recover ; but the judge ruled otherwise.

The plaintiff then offered evidence of a custom or usage, to explain the eighth rule (recited hereafter, in the opinion of the court,) of the commissioners of pilots, regulating the pilotage of the harbor of Boston ; to wit, that the pilots of this harbor had, for the last forty years, piloted vessels that were to unlade their cargoes at the town of Weymouth, and all other towns situated on rivers emptying into the harbor of Boston, as far as the mouths of said rivers, and then left them to take a river pilot ; and that the waters of the Boston pilots extended only to the mouths of said rivers. But the judge ruled that this evidence was inadmissible, and rejected it. A verdict was returned for the defendant, and the plaintiff alleged exceptions to said rulings.

*Tukey*, for the plaintiff.

*Wheelock*, for the defendant.

The opinion of the court was delivered March 23d 1846.

HUBBARD, J. The plaintiff is a branch pilot for the harbor of Boston ; and this is an action of assumpsit to recover his fees for offering his services to the defendant to pilot the brig Zephyr, under his command, into that harbor. The brig was a foreign bottom, and subject to the pilotage laws of this Commonwealth. She was bound up Weymouth River, and the plaintiff declined taking her up as far as the master wished to go, but offered to carry her to the place where she might take a river pilot. This the defendant declined, after attempting to make a bargain with the plaintiff, who refused to take the vessel up the river, or to receive less than the Boston pilotage.

In support of his action, the plaintiff contended that his offer was embraced within the provisions of the statute regulating the pilotage of vessels into the harbor of Boston ; and he further offered to prove that, for the last forty years, it has

been the custom or usage of the pilots of Boston harbor, when employed in piloting vessels bound to places situated on rivers emptying into that harbor, to conduct them as far as the mouths of the rivers, and then leave them to take a river pilot ; and that the waters of Boston harbor extend only to the mouths of the rivers. The construction contended for, and the evidence offered by the plaintiff, were rejected by the learned judge who presided at the trial, and the defendant had a verdict. And the questions presented for our consideration arise on the correctness of these rulings.

This is an important inquiry, not only as it respects the rights of a most deserving class of our citizens, but as it regards the security of our commerce, which is of increasing value, as well to the neighboring towns communicating with the harbor of Boston by the rivers which discharge into it, as to the city itself.

Although the statute does not make it incumbent on the master of a vessel, subject to pilotage, to receive a pilot, if he chooses to navigate her himself, (Rev. Sts. *c.* 32, § 12,) yet it does not absolve him from liability to pay the full pilotage fees, when the offer of service has been seasonably made. And the master of a vessel, who neglects or refuses to take a pilot on board his vessel, where provision is made for the receiving of pilots, exposes his owners to respond for the damage which may follow from such neglect or refusal. The law merchant acts in unison with the maritime and statute laws relating to pilotage, and, in its beneficial influence, lends its aid to the preservation of the lives and property of citizens that are exposed to the perils of the sea.

Attempts, therefore, to evade the laws securing pilotage to the regular pilots, will be looked upon with a jealous eye, as endangering interests of great value ; and the courts are bound to give such a construction to the statute as will best effectuate the intention of the makers.

The defendant contends that his vessel was not bound into the port or harbor of Boston, and that the plaintiff, in offering to pilot her into and through the waters of said harbor, she

being bound to Weymouth, did not entitle himself to his fees, within the meaning of the statute. In support of this position, the defendant relies particularly upon the case of *Nash* v. *The Schooner Thebes*, decided in the district court of the United States for this district. That was a claim, on the instance side of the court, by a branch pilot for the harbor of Boston, to recover his fees for the offer of service, eastward of the statute line, to pilot the schooner, which was subject to pilotage. The offer was refused, because she was bound from Digby (N. S.) to Lynn, and not to Boston. The libel also contained similar claims for offers of pilotage on subsequent voyages of the same schooner, when bound from Digby to Dorchester, and which offers were refused for the same reason. The learned judge, in coming to the conclusion that the schooner was not bound into the port or harbor of Boston, within the meaning of the law, grounded his reasoning principally upon the construction to be given to the eighth rule of the commissioners of pilots for the harbor of Boston ; considering that the revised statutes had neither prescribed the fees nor defined the duties of pilots for the harbor, but had left that to be done by the commissioners, who are authorized to appoint and commission pilots for said harbor, and to make regulations respecting pilotage. Rev. Sts. *c.* 32, §§ 15–22. That rule is as follows : " It shall be the duty of every pilot, after having brought a vessel into the harbor of Boston, to have such vessel properly moored in the stream, or secured to a wharf, at the option of the master, within twenty four hours after the arrival of said vessel, if the weather permits, without extra charge. The pilot, if called upon, after the expiration of twenty four hours from her first anchoring, to haul any vessel into the wharf, shall be entitled to receive three dollars for his services ; and a pilot shall be entitled to receive the same for taking a vessel from the wharf into the stream, provided said vessel does not proceed to sea within twenty four hours from the time of her anchoring in the stream."

The learned judge held, that the duty of the pilot, to enti-

tle him to his fees, was an entire one, including that of se-
curing the vessel to a wharf, or mooring her in the stream, in
a place of safety ; and that these regulations, which are to be
considered as incorporated into the statute, do not contemplate
a case in which only a part of the service can be performed
in the harbor of Boston, and where it must be completed in
another port ; and further, that if the track of the schooner, in
going to Lynn or Dorchester, would be over waters which
might, for any purpose, be deemed within the limits of Bos-
ton harbor, yet it did not appear that there was any anchorage,
or any place used as a harbor for repose or security, or where
a vessel could be moored in safety, in any part of such track ;
and, consequently, that the passing through a part of the har-
bor of Boston, in going to Lynn or Dorchester, did not pre-
sent the case of a vessel bound into the harbor of Boston, so
as to entitle the libellant to his fees under the statute.    The
learned judge also held that, if it were so, a Lynn pilot, duly
commissioned by the governor, who should merely conduct a
vessel from sea, directly to his own port, would incur the pen-
alty, imposed by § 23 of *c.* 32 of the Rev. Sts. for piloting a
vessel into Boston harbor ; which section prohibits, with cer-
tain exceptions, any person, not having a branch for the har-
bor of Boston, from piloting vessels into or out of that harbor.

A strict adherence to this decision would be fatal to the
plaintiff's claim, in the present suit.    But, with the greatest
respect for the learning and sound judgment of that court, we
are not satisfied with the entire decision ; nor do we feel that
it is conclusive upon this court in the construction to be given
to one of the statutes of the Commonwealth.

In the present case, therefore, it becomes important to as-
certain, with some precision, what are the extent and limits
of the harbor of Boston, the same not being specifically de-
fined in the statute, and whether parol evidence may not be
admitted to prove them.

The pilotage of vessels has been the subject of public inter-
est for more than sixty years past ; and the reason assigned
in the first statute for its regulation was, that frequent and

heavy losses had been sustained, and navigation greatly in-
jured, for want of a well regulated pilotage in various harbors
of the Commonwealth.  *St.* 1783, *c.* 13.  This statute con-
tinued in force, with occasional modifications, till its revision,
with the other statutes of the Commonwealth, in 1836, when
all its important provisions were reënacted.

The 32d chapter of the Rev. Sts. § 5, authorizes the gov-
ernor, with the advice of the council, to appoint pilots for the
several harbors and coasts of the State, with the exception of
pilots for the harbors and ports of Boston, New Bedford and
Fairhaven, for the appointment of which special provisions
are made.  It then proceeds, in § 8, to constitute several dis-
tricts of that part of the coast which lies between the Isle of
Shoals and the point of Cape Cod, and to each district it as-
signs pilots.  These pilot districts are thus described : " The
pilots for the ports of Salem and Marblehead, from Nahant
Rock on the south, to Norman's Woe on the north; the pilots
for the port of Gloucester, from said Norman's Woe, round the
Cape, to Chebacco Bar, so called ; the pilots for the port of
Newburyport, from Chebacco Bar on the south, to the Isle of
Shoals on the north; the pilots of the port of Plymouth, from
the highlands of Marshfield on the north, to the point of Cape
Cod on the south ; the pilots for the coast of Nantucket, to
take charge of any vessels on the coasts thereof that shall be
bound over the shoals."  And, in other sections, further pro-
visions are made for the southern ports of the State.

It is very obvious, from this arrangement, that the district
which includes the harbor of Boston extends from Nahant
Rock on the north, to the highlands of Marshfield on the
south; otherwise, no provision is made for the ports lying
within those headlands.  And that such is the district is cer-
tain, upon reference to the *St.* of 1783, *c.* 13, § 3, in which
the several pilot districts were originally designated.  That
section begins thus: " That the districts of the several pilots
be, and they are hereby limited, in manner following, viz.
the pilots for the port of Boston, from the highlands of Marsh-
field on the south, to what is usually called Nahant Rock on

the north ; " and then proceeds, as in the revised statutes. Why this first clause was omitted, in the revision of the statute, is not very apparent, as the revisers, in their notes, propose no alterations. But though the clause is omitted, the construction to be given to the two statutes, as to the districts, is the same.

It may also be observed that the words "port" and "harbor" are commonly used, in both statutes, as synonymous terms; but, in § 4 of the old, and in § 9 of the revised statute, the word "port" is more expressly applied to the particular place named, and "harbor" is used in a more general sense. Those sections provide that each of the branch pilots shall keep one decked boat, and a sufficient number of suitable row boats; and that one of the said decked boats, for the port of Plymouth, shall be stationed in the harbor of Plymouth ; two for the port of Salem, in the harbor of Salem, &c. And in the first statute there is the provision, that "one of the boats, for the port of Boston, shall be stationed at the Light House Island ; " which clause is omitted in the revised statutes.

The rights of a Boston branch pilot, in demanding the pilotage of vessels into the harbor of Boston, are marked by a line drawn from Harding's Rocks to the Outer Graves, and from thence to Nahant Head, to the eastward of which pilots must offer their services, to entitle themselves, as of right, to their fees. Rev. Sts. *c.* 32, § 24. This line, however, is not, that we are aware, coincident with the eastern bounds of the harbor ; it being laid down with another intent than to define that bound. The object of the legislature, in drawing it, was to provide for the protection of the shipping, by compelling the pilots to cruise at such a distance from the land as to afford the greatest security to vessels within the bay and inward-bound, and, in describing the line, to select such monuments in the course of it as to prevent disputes between the shipmasters and pilots. This line was prescribed by *St.* 1819, *c.* 45, § 1, which gave full rates of pilotage to branch pilots offering their services before vessels should be to the westward of the said line ; and if the pilot offered his services after the

32 *

vessel had passed that line, and before she was to the westward of the light house, (if in Light House Channel,) or before the light house can be seen to westward of the Great Brewster, (if in Broad Sound,) and they were not accepted, he should be entitled to half the usual rates of pilotage. This last provision, as to the inner line, was repealed by *St.* 1829, *c.* 2, §§ 4, 5; and the revised statutes assume the line as laid down in the last mentioned statute.

The term " port " of Boston, or "harbor " of Boston, as thus used in the several acts for the regulation of pilotage, in our judgment, is not satisfied, by restricting its meaning and application to the city of Boston, and to vessels entering its docks and lying at its wharves, or in the stream, between them and the inner islands of the harbor. It is, we think, a term or designation which clearly includes all those ports which use the several channels leading to the city of Boston itself; and this embraces the mouths of the various rivers which empty into the harbor. That it does not extend further, and include other towns on the seaboard, not using these channels, we do not decide; it not being required by the case at bar.

We differ from the restricted construction given to the term " port," or " harbor," of Boston, in the decision relied upon; and we think the error, in that respect, lies in adopting the rule of the commissioners of pilots as giving the true meaning of the term.

The rule or regulation referred to is, in our judgment, drawn with another object, having no design to describe the extent of the harbor of Boston, as intended by the statute, and as understood by those navigating the waters of the bay; but as defining the duties and the rights of pilots, in respect to those vessels bound into, and coming within the limits of, the waters of the city of Boston, with intent there to unlade or to take in cargo. And this, we think, is obvious from all the provisions of the regulation. As to such vessels, we think its terms must be complied with, when not waived, to entitle the pilot to his fees; but that as to vessels bound to ports in the harbor

of Boston, other than the city, it neither does nor was intended to apply.

As to the argument used, that, upon the enlarged construction contended for in the case of the schooner Thebes, a vessel bound to Lynn might be compelled to take not only a Lynn pilot, but a Boston pilot also, and that a Lynn pilot would be exposed, in conducting a vessel to sea, to the penalty of § 23 of *c.* 32 of the Rev. Sts., we say that we are not aware that any pilots for the port of Lynn have ever been commissioned by the governor, and therefore the case supposed cannot arise. If such pilots should hereafter be appointed, there will probably be such provisions, in relation to their prescribed duties, as will prevent an interference between them and the branch pilots of Boston harbor.

In regard to the evidence which was offered on the trial, and rejected, we think it is competent for the parties to prove, by the testimony of witnesses, what are the limits of the pilotage ground in the harbor of Boston, and whether there exists a custom or usage of the commissioned or branch pilots of that harbor, in piloting vessels to Weymouth and other towns situate on rivers emptying into the harbor, to take them as far as the mouths of the rivers, and there leave them in the care of the masters, or in the custody of the river pilots; or whether it is the usage to take them up the rivers, to the several wharves where they are ultimately to unlade. And it will then appear whether there is suitable anchorage for vessels at the mouths, or in the neighborhood, of the rivers.

The ports within Boston bay are important places. They are within the purview, and entitled to the benefit, of the law providing pilotage for our extended and often dangerous coast. There are no pilots assigned to any of the ports within this bay, besides those commissioned by the trustees of the Boston Marine Society. Rev. Sts. *c.* 32, § 16. And, in our present view of the case, (which may be affected or altered by evidence that may be introduced,) it is as much the duty of these pilots to take the charge of a vessel, subject to the pilotage aws outside the defined line, when bound to Weymouth or

Dorchester, Cambridge or Charlestown, as when bound to Boston; and the same liabilities for a refusal in such a case would be incurred by them, as if the vessel was sailing directly for Boston; and that they, therefore, have the right to demand their fees, on their offer to pilot being made and refused.

In enumerating these ports, that of Lynn has been designedly omitted, as being a port that may be reached without using the channels leading directly to the city of Boston.

For the reasons stated, we are of opinion that the ruling was erroneous, and that the evidence should have been admitted.

*New trial granted.*